Our last case this morning is United States v. Adair. May it please the Court, my name is Michael Chandra, Carl Briney and I are counsel to Mr. Adair in the appeal of the denial of his motion to suppress. On the night of September 21, 2017, police responded to a 911 call. Mr. Adair argued below and on appeal that police did not have reasonable suspicion to First, the 911 call reported mere gun possession. The 911 call reported a concealed firearm at present transcript page 39 as referenced in defense brief page 24. Officer Squires agreed that there was no brandishing. Additionally, this court in Williams, citing J.L. at footnote 1 in Williams, distinguished the concealed gun in J.L. from the brandishing that occurred in Williams. There was no brandishing and on that point there wasn't an emergency. The question then is, was there a crime that was specified by the 911 caller? In defendant's brief, defendant goes through about six different statutes that could be reason, predicates for a crime being committed by possessing a firearm. The government proposes a seventh, but in the defendant's reply brief, we note that even that statute that the government relies on doesn't immediately say that the action of possessing a gun is a crime. A person who possesses a firearm legally can drink a beer and not be in violation of the law if there isn't an impairment under the Illinois statute. I think the point you're making and articulating it well is along the lines of the reasoning that Judge Hamilton outlined in the Williams opinion. But even there, he recognized there's certainly nothing improper. In fact, it would be irresponsible of the police not to respond to this 911 call, right? And you're not arguing that. I know that. That's entirely correct. In fact, at the end of the Watson opinion, Judge Barrett lays out that even in that case where the court found that the evidence should have been suppressed, the police can respond. They should. They should respond. They should do investigations. They can talk to people. They can do consensual encounters. So shouldn't your focus then be on what went down, what officer squires saw and perceived and whether that created reasonable suspicion or not? As well as Officer Fostick, yes. But the first point is an important one because the government has maintained that there is an emergency. Laying it out in terms of how the case law works in terms of firearms, this is an important point to make. The second point that we want to make is that it was a generalized search. Now it's important in this case that police are responding not to a car like in Watson where everybody's located in one single place. They're not responding to a Navarette call where it's one car that's going down a road and then there's not a bunch of traffic. They're not responding to an Abrezu scenario where there is a single car that triggers magnetic sensors and they're traveling down an isolated road. This is an open parking lot on private property. The caller describes a group of people. That area itself has areas for ingress and egress. The people who are on the property can go through the back of the property into a trailer park. The police agree that they are not, Officer Squires agrees at the suppression hearing that police were not trying to stop people from going out of the parking lot or stopping them from coming into the parking lot. There's no control of people whether they're going into and out of the apartment building. That also plays a factor in terms of how do you understand this 911 call and who are the, of the people that you see, whether or not the 911 call matches up to any of the people there. Well the 911 caller said that none of the people lived at this location and that they were behaving suspiciously, just sort of undifferentiated, but behaving suspiciously and that one of them had a gun because she saw it in his pocket. Yes, Your Honor. But it's important that, in fact, the 911 caller was wrong. The people that were assembled there, Ms. Medina Bradley and Mr. Tillery. That's post-talk. We're talking about what the officers knew from the dispatch. Sure. And so at that moment and whether that gave rise to reasonable suspicion. But the question is when police are responding to a call that's non-emergency, where there is a question about whether there's crime being committed, can they immediately perform a stop and seizure? Can they seize people and can they do a frisking? And the argument is that no, they don't have reasonable suspicion to do that. They have to do investigation of that 911 call. When they come there, there are facts available for them to find out. But what do they do here in the situation? Officer Squires gets there. He knows Mr. Adair. He knows he's a convicted felon. He sees Mr. Adair trying to move away from him and then he notices what appears to be a gun in his front pocket. Why wouldn't that provide sufficient basis for the Terry step? Well, two things. First is that this court in Watson at 897 noted, but determining what was happening and immediately seizing people upon arrival are two different things. That court said that when you're doing the analysis of reasonable suspicion and doing a totality of the circumstances analysis, the police are not relieved from the duty of doing an investigation of what's happening there. There were facts for them to determine about whether or not people actually did live there, whether the people were guests. That wasn't necessary once the officer recognized Mr. Adair and knew he was a convicted felon. That makes his gun position unlawful and he can move in at that point. Your Honor, before Mr. Adair was stopped, before he was seized and before he was searched, the police conducted searches of two other people. That doesn't matter. We're talking about the search of your client. He's a known felon. He has what looks to be a gun in his pocket. That's unlawful. I disagree, Your Honor. The issue is whether that 911 call pointed, picked out a particular person. The evidence before the courts in the court below, as well as now on appeal, is that Officer Fosdick had exactly the same information? So what you're saying is if a 911 call doesn't provide the basis once officers arrive at a scene for reasonable suspicion, if they see something else when they're there that does cause reasonable suspicion, they should ignore that? No. They have the ability to investigate. They have the ability to talk to the people there. When you say investigate, I'm sorry to interrupt you, but maybe you can just, and build this into your response. I think that's what the, wasn't that what Officer Squires was doing? I mean, he responded to the 911 call. He shows up. He sees this group of folks. He's approaching, like, hey, what's going on here? And then the reasonable, in other words, I don't know what the content is of he should conduct an investigation. Your Honor, so there's a, the 911 call comes in. There are five people that respond, five officers, four or five officers, and one of the officers had exactly the same information, and went to people that apparently were not wearing long sleeves, were not wearing a hoodie, but had the same information. Officer Squires said that. There's only one person here who matches his description. Officer Fosdick's behavior is absolutely contrary to that. So what is it you think Officer Squires should have done in terms of additional investigation before patting down your client? I don't think that he should have been able to pat down Mr. Adair. I think that if he had gone and talked to, asked people, we had received a call. Is there, well, first, like, who's in charge here? So you don't think, and sorry to interrupt, you don't think when he sees a gun in the pocket of a convicted felon that he can approach him at that point, that he has to conduct additional investigation? Your Honor, he didn't see a gun. He saw that the person was using their pockets. He saw a bulge that appeared to be a gun. That's what he testified to, and the district court found him credible. He was in a group of 10 people. But that matched the description of the caller who said that the gun was in his pocket. He wasn't wearing a hoodie. Well, that's a separate issue, and I thought we were going to get to Hoodiegate here. So let's talk about Hoodiegate, and whether there was a hoodie or not. Your Honor, I have 45 seconds. May I reserve, please? Sure. Good afternoon, Your Honors. Paul Morse on behalf of the United States. Your Honor's questions really get at the heart of this. What should the Bloomington Police Department have done in this case? They did what they were supposed to do at 1047 at night, responding to a 911 caller that was willing to give her name, and they showed up. And they were investigating crime. They were concerned about, and what the 911 caller was concerned about, was the gun. The displayed gun. A gun that just wasn't in the pocket. She knew it was a black gun. And walking by, almost contemporaneously, she's looking at this gun. She's calling in 911, and minutes later, the Bloomington Police Department is there. Equally concerned, eyes open, in an observation of their investigation of what else is going on. And so, yes, at arrival, Officer Squires is looking for the individual matching the suspect with the gun. But then he sees somebody he knows. He sees Mr. Adair. There's a couple things that's important about that. As Your Honors have already pointed out, he's a known felon, a felon prohibited from having a firearm. Also corroborating the 911 call, he doesn't reside there. Officer Squires testified he doesn't even reside in that vicinity. So here you have this investigation, this corroboration of this 911 caller, adding reliability of what's going on. But more to that, and what the thrust, really the clutching circumstance is, 911 caller says the gun is in the pocket. He's approaching the defendant. And the defendant is trying to place the group between himself and Officer Squires. He's acting evasively. It's one factor. But there's bulging in his pockets. And he sees an object that can be consistent with a gun. And so the totality of those circumstances. Mr. Morris, for discussion purposes, and you can challenge the premise of this if you'd like, let's assume that the photos are clear enough that there's not a gray hoodie. Just assume that. How does your analysis proceed from there? It's a good question, Judge Scudder, because it's not just a hypothetical. The district court takes that as its alternative ruling. It says, let's take this hoodie off. Do we still have reasonable suspicion? And the ruling is yes. And the way that it arrives at that conclusion is it contrasts Mr. Adair with the other people in that group. You have descriptions as government exhibit provides of the officer's police report of what everyone else is wearing. You have the testimony. Everyone else was wearing tank tops and t-shirts. You've got another individual that's wearing, and the only one wearing, a long-sleeved shirt. And so arriving there, and we make the point, a legal point of reasonable mistakes of facts, reasonableness, the touchstone of the Fourth Amendment. Right. But this wasn't, I mean, this whole hoodie issue is what dominated the suppression hearing and was so controversial in most of the briefing as well. And there wasn't an argument advanced that the officer was mistaken when he said Mr. Adair was wearing a hoodie, or that the inventory report at the jail was mistaken when it inventoried a hoodie. Yes, Your Honor. But the pictures show there's no hoodie. So to answer maybe both of your questions, that if it was crystal clear that there wasn't a hoodie, and then to your point, that if the picture was crystal clear, which the government doesn't agree that it is, but if it was, that the district court was still reasonable in its finding that... Just let's take the premise first. The pictures from the squad car, you're taking the position that those are unclear? Well, actually, Mr. Adair is calling them on page nine of his reply brief, calling the pictures from the squad car as being reliable, and then two lines down, the picture from the squad car as being unreliable. I just want to state, where did the pictures come from? Officer Squires created these pictures by turning on his squad car camera. It is a low-quality squad car camera taken from above, and you've got somebody that's seated... It's a lot higher quality than the one at the jail, which the government relied on below. And so if I could just make sure that we're all on the same page, those are from the exact same camera. The one from the jail is from the car. The ones of him seated in the back are from the car. So it captures something outside the car. That is right, and the reason for the government selecting that image, it's really the only image that we have that is similarly situated to how Officer Squires saw Adair upon walking up to that group. It's him standing, not seated. It's him with his backside, which would show a hoodie, and the district court looking at that... So would you agree that the photographs at Appendix 19 and 20 where Mr. Adair is leaning forward and you can see the back of his neck, would you agree there's no hoodie there? Yeah, I would agree with what defense counsel responded to at the district court when really asked that question, what does that mean? And in that response on page 97, and I think it's a fair response when asked, well, what do we do? There's... Just because the pictures in your mind show there's no hoodie, what does this mean? And defense counsel, Mr. Chandra says, we believe so, Your Honor. On the other hand, so it's either there is a hoodie there for whatever reason, there is some principle that the camera couldn't pick it up, either when he's leaning down or looking up, that there are no drawstrings, that there is just no cowl, that there was no hoodie. And so even in that exchange, Mr. Chandra is allowing for the universe of hoodies to be broad. So are you saying... There's no hoodie in this picture, in the one where he's bending over. There in either one, I do not see a hoodie. But are you saying that doesn't matter because that's not the view or the angle that Officer Squires had, instead, he saw Mr. Adair in the same view that the government exhibit showed him? Or are you saying something else? I understand your question. The importance is that when the district court looked at the images we're talking about, he reached her same conclusion. I can't see a hoodie there. I thought the position... Go ahead, finish. I was just going to say that when he looked at the picture of Mr. Adair standing on the outside, he said he saw a fabric, a thin fabric that was consistent with a hoodie. So he has two competing ways that he can go. And so under the clear air standard, even if it was just those two images, he should be entitled to that deference in making his decision along with the testimony of Officer Squires. But that's not what he did. He also included an inventory report where another officer had Mr. Adair take off his clothing and then wrote down, gray hoodie. This is another person entirely detached from Officer Squires. And so in terms of what the district court relied upon in making that decision, the government's position is that it does not amount to clear air, that factual point. I thought the position that you might take, Mr. Morris, is that, look, Officer Squires is just wrong. He's just simply wrong. There is no hoodie, you know, full stop. There's ambiguity with the property log and what have you, but it's as clear as day there's no hoodie. And then I thought what you would do is you would hang your argument on the alternative reasoning. That's where I thought you were going to go. I think the pictures are, I mean, it looks to me like it's a long sleeve t-shirt of some kind. And we make that argument, we still stand by that argument as the alternate ruling of the district court that he's, as I stated, the only one with a long sleeve shirt. He's the only one that, as they walk up, that is acting evasively. He's the one with a pocket, in his pockets, bulging in the same location as a 911 caller said the gun was. And so, I mean, the totality of those circumstances, along with also knowing that he doesn't live there, knowing that this is a higher crime neighborhood, all of those circumstances still fit without a hoodie. And so, you know, if you excise the hoodie, the totality of the circumstances of the 911 caller willing to give her name, the gun in the pocket, the evasive behavior, that they're drinking, she characterizes it as acting suspiciously. He sees the group corroborating the 911 caller, he sees the defendant, the defendant matches the suspect, even taking the hoodie out with a long sleeve shirt, everyone else has got pink tops or t-shirts, he knows he's a felon, you know, he can't have a gun, a dare is evasive. And lastly, the bulging pockets. All of those factors that I just listed are what the district court took into consideration  subject to any questions that you may have. Thank you. Thank you. Mr. Changer. Your Honors, the 911 caller's description is important because that is what prevents the search becoming a generalized search. Once that, if it's just a short black male, anybody in that group gets searched, and that's in fact what happens. You have Mr. Tate and two people searched before Mr. Adair using the same search criteria, and then they find upon Mr. Adair. If we find that the hoodie finding of the district court was clear error, how does that affect the rest of the officer's testimony? That affects the officer's testimony in the way that then the only thing that's left of the 911 caller's description paints almost everybody in the group in an open environment where people can leave. And under Williams and under Watson, that's not enough. All right. Thank you, Your Honor. Thank you. Our thanks to both counsel. The case is taken under advisement.